IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



UNITED STATES OF AMERICA,

v.                                  Criminal No. 3:18-cr-149

RODOLFO SEGURA-VIRGEN,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on DEFENDANT'S MOTION TO DISMISS THE INDICTMENT (the "Motion") (ECF No. 11) which, for the following reasons, will be denied.

### BACKGROUND

### I.  Procedural Context

Rodolfo Segura-Virgen ("Segura")[1] was charged in a one-count indictment with violating 8 U.S.C. § 1326(a) and (b)(2) by re-entering the country after having been removed. ECF No. 1. On February 22, 2019, Segura filed the Motion. ECF No. 11. The parties fully briefed the Motion, and, on April 9 and 10, 2019, the Court received evidence and heard oral argument on it. The Motion is now ripe for decision.

### II.  Factual Background

Segura is a citizen of Mexico. ECF No. 12 at 1; Gov't Ex. 2.

---

[1]    The Court follows the lead of counsel for the Defendant in referring to Segura-Virgen as "Segura."

He entered the United States illegally at or near San Ysidro, California on or around June 1, 1990, when he was nine-years-old. Gov't Ex. 2.

In September 1993, Segura's mother filed an I-130, a "Petition for Alien Relative" (the "I-130"). ECF No. 11-2; Def. Ex. A. As confirmed by the Government's witness, retired immigration official Michael Toms ("Toms"), the filing of an I-130 does not itself grant an alien any legal status. Further proceedings are required before that can happen. A stamp on the I-130 indicates that it was "approved" by immigration officials on August 6, 1998. ECF No. 11-2; Def. Ex. A. Toms testified that the notation "approved" means only that immigration officials confirmed the existence of a relationship between Segura and the individual who filed the I-130 (his mother). Toms testified that, following such an approval, the alien would then be interviewed by immigration officials and would have to apply for an adjustment of his immigration status. The record shows that those steps did not happen in this case.[2]

On January 6, 2001, Segura, then 19, was arrested in California and charged by information with four separate counts of

---

[2]     Segura's brief classifies the I-130 as "pending." ECF No. 11 at 1.    Segura briefly argues that the I-130 form is relevant to the prejudice analysis under 8 U.S.C. § 1326(d)(3). As discussed below, the Court does not reach the prejudice analysis, so it is unnecessary to further consider the I-130.

engaging in "unlawful sexual intercourse with a minor. . .15 years old,[] who was more than three years younger than said person, in violation of [California] Penal Code Section 261.5(c), a felony."[3] Gov't Ex. 1. Each count also alleged that

> in the commission of the above offense [Segura] personally inflicted great bodily injury upon [the minor], not an accomplice to the above offense, within the meaning of [California] Penal Code Section 12022.7 and also causing the above offense to be a serious felony within the meaning of [California] Penal Code Section 1192.7(c)(8).

Id. On March 23, 2001, Segura was convicted of one count of violating Cal. Penal Code § 261.5(c); the portion of the charge relating to "inflict[ing] great bodily injury" pursuant to Cal. Penal Code § 12022.7 appears to have been dropped, as were the other three counts. Id.; Gov't Ex. 2. Segura was sentenced to up to one year in prison. Id.

Thereafter, immigration officials instituted expedited removal proceedings against Segura pursuant to 8 U.S.C. § 1228 ("Expedited removal of aliens convicted of committing aggravated felonies"). On August 16, 2001, the Immigration and

---

[3]   This provision reads: "Any person who engages in an act of unlawful sexual intercourse with a minor who is more than three years younger than the perpetrator is guilty of either a misdemeanor or a felony, and shall be punished by imprisonment in a county jail not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170." Cal. Penal Code § 261.5(c). A "minor" is defined as "a person under the age of 18 years." Cal. Penal Code § 261.5(a).

Naturalization Service ("INS") prepared a Form I-851, "Notice of Intent to Issue a Final Administrative Removal Order," (the "I-851 form"), in Segura's case. Gov't Ex. 2. The front page of the I-851 form reflected that Segura had been "convicted in the Superior Court of California, in and for the County of Kern, for the offense of Unlawful Sexual Intercourse, in violation of Section 261.5(c) of the California Penal Code." Id. The I-851 then informed Segura that he was removable under 8 U.S.C. § 1227(a)(2)(A)(iii) "because you have been convicted of an aggravated felony as defined in. . .8 U.S.C. § 1101(a)(43)A."[4] Id.

The I-851 form, written in English,[5] contains a "Your Rights and Responsibilities" section, which informed Segura that he could be represented by counsel during his removal proceedings; that he could respond to the charges in the I-851 form within 10 calendar days of service of the I-851 form;[6] and that he could seek "judicial

---

[4]    8 U.S.C. § 1101(a)(43)(A) defines "murder, rape, or sexual abuse of a minor" as an aggravated felony.

[5]    At the evidentiary hearing, counsel for Segura acknowledged that Segura speaks fluent English and understands it as well because he grew up in the United States and attended school here. And, Segura asked to proceed without the aid of an interpreter. The record establishes that Segura speaks and understands English and that he did so at the time of his removal proceedings.

[6]    Segura was informed that, in any response, he could: request an extension of time to respond; rebut the aggravated felony charges (with supporting evidence); request an opportunity to review the government's evidence; admit deportability; designate the country to which he chose to be removed; and/or request

review of any final administrative order by filing a petition for review within 30 calendar days after the date such final administrative order is issued, or you may waive such appeal by stating, in writing, your desire not to appeal." Gov't Ex. 2.

On the back of the I-851 form, the Certificate of Service reflects that it was served "in person" on Segura on August 17, 2001 by Michael Toms. Gov't Ex. 2. Below the Certificate of Service, Segura signed under a line that stated: "I acknowledge that I have received this Notice of Intent to Issue a Final Administrative Removal Order." Id. Segura's acknowledgment occurred on August 17, 2001 at 1 p.m. Id. In the middle of the back side of the I-851 form, there is a section captioned: "I Wish to Contest and/or to Request Withholding of Removal" that contains several check boxes. Id. Segura did not select anything in that section. Instead, he filled out the bottom section of the I-851 form, captioned: "I Do Not Wish to Contest and/or Request Withholding of Removal."[7] Id. In that section, Segura selected a check-box that read:

---

withholding of deportation under the Convention Against Torture. See Gov't Ex. 2.

[7]    Toms testified that it was his practice to read the I-851 form to the alien and that, if the alien agreed to select a particular item on the form, Toms would place an "x" in that particular check-box. Toms testified that the "x" marks on Segura's I-851 form were written by Toms, but that Segura agreed with the selections and signed the I-851 form.

5

> I admit the allegations and charge in this
> Notice of Intent. I admit that I am deportable
> and acknowledge that I am not eligible for any
> form of relief from removal. I waive my right
> to rebut and contest the above charges and my
> right to file a petition for review of the
> Final Removal Order. I wish to be deported to
> [Mexico].

Id. Below that, Segura selected a check-box that stated: "I also waive the 14 day period of execution of the Final Removal Order."[8] Id. Segura and Toms signed below these waivers, which were also dated August 17, 2001 at 1 p.m. Id.

Thereafter, also on August 17, 2001, a Final Administrative Removal Order (the "2001 Final Order") was issued to Segura by the INS. See Gov't Exs. 3(a) and 3(b). The 2001 Final Order stated that Segura was deportable because: (1) he was not a citizen or national of the United States and was not lawfully admitted for permanent residence; (2) he had a final conviction for an aggravated felony as defined by 8 U.S.C. § 1101(a)(43)A; (3) he was ineligible for discretionary relief; and (4) clear, convincing, and unequivocal evidence supported the decision. Id. It also reflected that "Petition for review" was "[w]aived by respondent." Id. Toms testified that this box would be selected where, as here, the alien chose not to contest deportation (as

---

[8]    As discussed further below, an alien in expedited removal proceedings has a statutory right to remain in the United States for 14 days after a final removal order is issued to apply for judicial review. See 8 U.S.C. § 1228(b)(3).

indicated on the I-851 form). Id.; see also Gov't Ex. 2.

At the evidentiary hearing, Toms further testified about the procedures by which the 2001 Final Order was served on Segura. First, Toms testified that he and Segura were located in Bakersfield, California, and that the INS official who was authorized to sign the 2001 Final Order was located in the Fresno, California INS office, some 100 miles away from Bakersfield. Second, Toms testified that he served the 2001 Final Order on Segura in person, which is reflected on the Certificate of Service, and gave a copy of this document to Segura. Gov't Ex. 3(a). That copy, however, had not yet been signed by the authorized INS signatory in Fresno. Third, Toms faxed the 2001 Final Order (with the completed Certificate of Service) to the authorized INS official in Fresno. Gov't Ex. 3(b). Fourth, the INS official in Fresno, Darvin Weirich, signed the 2001 Final Order and faxed it back to Toms in Bakersfield. Id. Lastly, Toms testified that, upon receiving the fax from Fresno, he would have provided a copy of the 2001 Final Order (signed by Weirich) to Segura and put another copy in the A-file.[9] See id.

---

[9] Toms testified that he did not know whether there was any documentation indicating that the 2001 Final Order with Weirich's signature (Gov't Ex. 3(b)) was served on Segura. However, he did testify that his practice (and that of his office) at the time was to provide a copy of the final signed order to the alien and that he believed he did that in this case.

7

Once the 2001 Final Order had been finalized, a "Warrant of Removal/Deportation" ("Warrant of Removal") was issued for Segura on August 17, 2001. Gov't Ex. 4. Toms testified that the Warrant of Removal would have been filled out in Bakersfield and that then, Segura would have been transported to the border for deportation. The reverse side of the Warrant of Removal shows that Segura departed from the United States on foot to Mexico on August 18, 2001. Gov't Ex. 4. Before crossing the border, Segura signed the Warrant of Removal and his departure was witnessed and verified by an immigration official who also signed the Warrant of Removal. Id. At the time of his August 18, 2001 departure, Segura received a document informing him that he was "prohibited from entering, attempting to enter, or being in the United States. . .[a]t any time because you have been found deportable. . .and you have been convicted of a crime designated as an aggravated felony." Gov't Ex. 5. This document also informed Segura that thereafter he could petition the Attorney General for permission to enter the United States from outside the United States, but that, if he entered without such permission, he could be prosecuted under 8 U.S.C. § 1326. Id.

Around December 1, 2003, Segura returned to the United States illegally. Gov't Ex. 6. The record establishes that immigration agent Miguel Munoz encountered Segura on April 9, 2004, while

8

Segura was incarcerated at Calipatria State Prison in California.[10] Id. In a sworn statement to Agent Munoz, Segura acknowledged that he had been previously deported; that he had not sought the Attorney General's permission to re-enter the United States; and that he understood that he could face prosecution under 8 U.S.C. § 1326. Id. A "Notice of Intent/Decision to Reinstate Prior Order" (the "Reinstatement Order") was issued for Segura on April 9, 2004 to reinstate the 2001 Final Order. Gov't Ex. 7. Segura signed that document on April 20, 2004 and Immigration Officer Johnny Williams signed it on April 23, 2004. Id. When he signed the Reinstatement Order, Segura selected a check-box that read: "I. . .do not wish to make a statement contesting this determination." Id.

A "Warrant of Removal/Deportation" was then issued, and Segura (pursuant to the 2001 Final Order) was removed from the United States to Mexico (on foot) on April 30, 2004. Gov't Ex. 9. Once again, Segura received (and signed for) a document warning him that he could not enter the United States without permission of the Attorney General and advising him of the consequences of illegally reentering the United States. Gov't Ex. 8.

At a point unknown after April 30, 2004, Segura again illegally reentered the United States.    He was arrested by

---

[10]    The Government's witness, Immigration Officer Brad Long, testified that he believed Segura was in Calipatria State Prison on a probation or parole violation.

Chesterfield County (Virginia) Police on October 12, 2018 for felony destruction of property and released on bond. ECF No. 12 at 7-8. He did not appear at his court hearing, and was arrested on December 13, 2018 for failure to appear. Id. Immigration officials encountered him on December 15, 2018 while he was in Chesterfield County Jail; he was taken into immigration custody at that time. Id. Thereafter, he was indicted for the presently pending illegal reentry charge. ECF No. 1.

## DISCUSSION

## I.   Framework For Collateral Challenges To Prior Deportation Orders

Segura has been charged with illegal reentry under 8 U.S.C. § 1326(a) and (b)(2).  To prove that charge, one of the elements that the Government will have to establish is that Segura "has been denied admission, excluded, deported, or removed" and thereafter reentered the United States without, inter alia, the permission of the United States Attorney General. 8 U.S.C. § 1326(a). In United States v. Mendoza-Lopez, 481 U.S. 828 (1987), the Supreme Court of the United States held that, in illegal reentry cases, an alien has a due process right to challenge the underlying deportation order.  Thereafter, Congress codified the due process requirements in 8 U.S.C. § 1326(d). See United States v. Moreno-Tapia, 848 F.3d 162, 165-66, 169 (4th Cir. 2017); see also United States v. Guzman-Velasquez, 919 F.3d 841, 845 (4th

10

Cir. 2019). At bottom, Section 1326(d) "is concerned with failures of due process in an immigration proceeding that would make it fundamentally unfair to rely on a removal order coming out of that proceeding." <u>Moreno-Tapia</u>, 848 F.3d at 169. The statute focuses the inquiry on whether there are "procedural defect[s] in an immigration proceeding [that] insulate[] the resulting order from judicial review. . . ." <u>Id.</u>

Section 1326(d) sets out three elements that an alien must prove to challenge the underlying deportation order. In full, that subsection reads:

> In a criminal proceeding under this section [8 U.S.C. § 1326], an alien <u>may not challenge</u> the validity of the deportation order described in subsection (a)(1) or subsection (b) <u>unless</u> the alien demonstrates that—
>
> > (1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
> >
> > (2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
> >
> > (3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d) (emphasis added). The Fourth Circuit has held that, to satisfy Section 1326(d)(3), an alien "must show that (1) his due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." <u>United States v. El Shami</u>, 434 F.3d 659, 664 (4th

11

Cir. 2005) (quoting United States v. Wilson, 316 F.3d 506, 510 (4th Cir. 2003)). To show prejudice, the alien must show that, "but for the errors complained of, there was a reasonable probability that he would not have been deported." Id. at 665. An alien may be excused from meeting certain Section 1326(d) requirements if the underlying deportation proceeding was procedurally flawed in a material way. See Moreno-Tapia, 848 F.3d at 169; United States v. Lopez-Collazo, 824 F.3d 453, 459-62 (4th Cir. 2016) (due process violation where alien was served the I-851 form in language he did not understand); El Shami, 434 F.3d at 662-64 (excusal from Sections 1326(d)(1) and (d)(2) and due process violation where alien did not receive notice of his immigration proceeding).

It is evident from the statutory text that the defendant must satisfy (or be excused from) all three elements of Section 1326(d) to succeed in a collateral challenge. And, this Court has so held. United States v. Gonzalez-Ferretiz, No. 3:18-cr-117, 2019 WL 943388, *3-4 (E.D. Va. Feb. 26, 2019) (surveying Fourth Circuit and district court decisions and holding "that an alien may only challenge his underlying deportation order by satisfying the three requirements of Section 1326(d)"); see also Moreno-Tapia, 848 F.3d at 166; El Shami, 434 F.3d at 663; United States v. Gomez-Salinas, No.2:19cr10, 2019 WL 1141063, *2-4 (E.D. Va. Mar. 12, 2019) (Davis,

12

C.J.) ("[A] defendant must satisfy all three provisions [of Section 1326(d)] before he may wage a collateral attack on the prior removal order."); United States v. Romero-Caceres, 356 F. Supp. 3d 541, 547 (E.D. Va. 2018) ("[D]efendant here may not challenge the June 2007 Removal Order unless he meets all three § 1326(d) requirements."). The Court's analysis in Gonzalez-Ferretiz applies in full force here.[11]

The burden of proof to establish that the elements of Section 1326(d) have been satisfied "rests with the defendant." United States v. Galcia, No. 1:15cr59, 2016 WL 4054926, *2 (E.D. Va. July 26, 2016). And, that burden must be met by "a preponderance of the evidence." Id. (citing several cases). If the alien meets his

_____

[11]    As the Court discussed in Gonzalez-Ferretiz, language in Moreno-Tapia and a recent opinion by Judge Brinkema suggest that collateral challenges outside of Section 1326(d) might be possible. See Moreno-Tapia, 848 F.3d at 170 ("We need not decide today. . .whether due process might in some circumstances demand that an immigration order based on an unconstitutional conviction be subject to collateral attack."); United States v. Rivera Lopez, 355 F. Supp. 3d 428, 435 (E.D. Va. 2018) (it "remains an open question" whether "due process requires that a defendant be given an opportunity to bring a collateral attack beyond the requirements and limitations of § 1326(d)") (emphasis in original).

The Court continues to be of the view that, at this juncture, given the clear language of the statute and the fact that Moreno-Tapia, Lopez-Collazo, and El Shami all perform the collateral attack analysis solely within the Section 1326(d) framework, the cogent, well-reasoned approach taken in Romero-Caceres correctly sets out the proper framework for resolving challenges such as the one made here by Segura.

burden, "the illegal reentry charge must be dismissed as a matter of law." El Shami, 434 F.3d at 663 (citing Wilson).

In sum, collateral challenges in Section 1326 prosecutions must proceed pursuant to Section 1326(d) because of the clear statutory text and articulated Congressional intent. [12] Accordingly, if the Court determines that Segura has failed to satisfy any of the three elements of Section 1326(d), his collateral challenge must be rejected, and the Motion will be denied. Conversely, if Segura satisfies (or is excused from) the three elements of Section 1326(d), the illegal reentry indictment must be dismissed. See El Shami, 434 F.3d at 663.

## II. Analysis

Segura makes two arguments in support of the Motion. See ECF No. 11 at 5 (summarizing argument). First, he asserts that his conviction under Cal. Penal Code § 261.5(c) is not an "aggravated felony" as a result of the decision of the Supreme Court of the United States in Esquivel-Quintana v. Sessions, 137 S.Ct. 1562

---

[12]   The "Section-by-Section" analysis of the legislation that added Section 1326(d) states that the new subsection "allow[s] a court in a criminal proceeding against a deported alien who re-enters the U.S. to re-examine the underlying deportation order only if the alien" satisfies the three requirements of Section 1326(d). 140 Cong. Rec. S.5558-01 (daily ed. May 11, 1994), 1994 WL 181390, at *S5571 (emphasis added). "This language taken from United States v. Mendoza-Lopez, 481 U.S. 828 (1987), is intended to ensure that minimum due process was followed in the original deportation proceeding while preventing wholesale, time consuming attacks on underlying deportation orders." Id.

(2017). Accordingly, says Segura, the immigration officials in 2001 who ordered him removed based on his conviction for an "aggravated felony" acted without jurisdiction and their removal order is ultra vires. See ECF No. 11 at 5-10. Second, Segura argues that he can satisfy the requirements of 8 U.S.C. § 1326(d) to collaterally challenge his 2001 deportation. See ECF No. 11 at 10-15; ECF No. 13.

Because the Supreme Court's decision in Esquivel-Quintana is pertinent to both of Segura's arguments, it is appropriate to briefly address it. Then, this Opinion will briefly address the ultra vires argument, which the Court has previously rejected. See Gonzalez-Ferretiz, 2019 WL 943388, *5-6. It will then analyze whether Segura has met his burden under Section 1326(d).

## A. The Esquivel-Quintana Decision

Segura was deported in 2001 because immigration officials at that time determined that his conviction under Cal. Penal Code § 261.5(c) was an "aggravated felony" as defined by 8 U.S.C. § 1101(a)(43)(A), for "murder, rape, or sexual abuse of a minor."[13] In 2017, the Supreme Court decided Esquivel-Quintana v. Sessions, 137 S.Ct. 1562 (2017), wherein the Court squarely confronted the

---

[13]    Toms testified at the evidentiary hearing that his office had a list of California convictions that qualified as "aggravated felonies" for immigration purposes. He testified that he would have looked at that list to determine that Cal. Penal Code § 261.5(c) qualified as an "aggravated felony."

question of "whether a conviction under a state statute criminalizing consensual sexual intercourse between a 21-year-old and a 17-year-old qualifie[d] as sexual abuse of a minor under the [Immigration and Nationality Act ("INA")]. We hold that it does not." 137 S. Ct. at 1567. The defendant in Esquivel-Quintana had been convicted under the same statute at issue here: Cal. Penal Code § 261.5(c). Id. Employing the categorical approach, the Supreme Court had to determine whether the California statute was a categorical match with the generic federal definition of "sexual abuse of a minor." Id. at 1567–68. It concluded that it was not. Id. at 1567.

Under the categorical approach, "[r]egardless of the actual facts of petitioner's crime, we must presume that his conviction was based on acts that were no more criminal than" the minimum conduct prohibited by the statute. Id. at 1568. Under Cal. Penal Code § 261.5(c), that minimum conduct is "consensual sexual intercourse between a victim who is almost 18 and a perpetrator who just turned 21." Id. Then, the Supreme Court had to consider whether that minimum conduct fit the generic federal definition of "sexual abuse of a minor." See id. at 1568–72.

The Supreme Court concluded, after reviewing the text, surrounding statutory provisions, and state laws, that, "in the context of statutory rape offenses that criminalize sexual

16

intercourse based solely on the age of the participants, the general federal definition of sexual abuse of a minor requires that the victim be younger than 16." Id.; see id. at 1569-72. "Where sexual intercourse is abusive solely because of the ages of the participants, the victim must be younger than 16."[14] Id. at 1572. And, "[b]ecause the California statute at issue in this case does not categorically fall within [the generic federal definition of "sexual abuse of a minor"], a conviction pursuant to it is not an aggravated felony under § 1101(a)(43)(A)." Id. at 1568.

Segura is correct in asserting that Cal. Penal Code § 261.5(c) is categorically not a match for "sexual abuse of a minor" under the INA after Esquivel-Quintana. See ECF No. 13 at 1-4. The Government argues that the "decision made clear that if the victim was under 16 years old (as here the victim was 15), the conviction did constitute an aggravated felony under the INA." ECF No. 12 at 10. That contention is in error because Esquivel-Quintana squarely held that Cal. Penal Code § 261.5(c) was not an aggravated felony for "sexual abuse of a minor" because it did not require "that the victim be younger than 16" in the statute itself. See 137 S. Ct. at 1568-73; compare Cal. Penal Code § 261.5(c) with

_____

[14] The Supreme Court left open the question of whether "the generic crime of sexual abuse of a minor may include a different age of consent where the perpetrator and victim are in a significant relationship of trust." Id. at 1572. The parties do not argue that this open question is at issue in this case.

Cal. Penal Code § 261.5(d) (prohibiting individuals over 21 from engaging in unlawful sexual intercourse with a minor who is under the age of 16). In other words, although Cal. Penal Code § 261.5(c) could apply in cases with victims under age 16 (as here), it does not meet the generic federal definition of "sexual abuse of a minor" because it also criminalizes consensual sexual conduct "between a victim who is almost 18 and a perpetrator who just turned 21."[15] 137 S. Ct. at 1568. Accordingly, Segura is correct that, after Esquivel-Quintana, Cal. Penal Code § 261.5(c) does not qualify as an "aggravated felony" for "sexual abuse of a minor" under the INA.

However, that does not mean that the Motion should be granted. The Court now moves to the merits of Segura's argument.

---

[15] The Fourth Circuit recently considered the scope of Esquivel-Quintana. See Thompson v. Barr, __ F.3d __, 2019 WL 1867836, *4-5 (4th Cir. 2019). In Thompson, the Court held that a conviction under Va. Code § 18.2-370.1(A) (for taking custodial indecent liberties with a child) was an "aggravated felony" under the INA, even after Esquivel-Quintana. Thompson, 2019 WL 1867836, at *4-5. The Court held that Esquivel-Quintana was "focused on the narrow context of statutory rape," offenses that "criminalize sexual intercourse based solely on the age of the participants." Id. at *4 (quoting Esquivel-Quintana, 137 S.Ct. at 1568, 1572). Because there were several differences between statutory rape offenses (the Court cited Cal. Penal Code § 261.5(c) as an example of a statutory rape offense) and the Virginia statute at issue, the Fourth Circuit concluded that Esquivel-Quintana did not require a different outcome. Id. at *4-5. Thompson confirms this Court's reading of Esquivel-Quintana because Thompson cites Cal. Penal Code § 261.5(c) as a statutory rape offense and holds that Esquivel-Quintana is limited to statutory rape offenses.

### B. Jurisdiction

Segura first argues that he can challenge his 2001 removal wholly apart from the requirements of Section 1326(d). See generally ECF No. 11 at 5-10. In sum, he argues that, because his conviction under Cal. Penal Code § 261.5(c) was not an "aggravated felony," he was not amenable to removal on the ground charged. Id. As Segura sees it, the immigration official made an error of law in 2001 (there was no "aggravated felony"), and, as a result, the "officer who entered [the removal order] lacked subject matter jurisdiction to enter the order at all; it is ultra vires and void." Id. at 6. Thus, the argument goes, because the underlying deportation is void, there is no need for Segura to satisfy the Section 1326(d) requirements.

Recently, a nearly-identical argument was rejected in Gonzalez-Ferretiz, 2019 WL 943388, *5-6. Segura cites the same cases cited by Gonzalez-Ferretiz in support of his argument. Like Gonzalez-Ferretiz, Segura has not cited a single case that supports his argument in a Section 1326 prosecution. See ECF No. 11 at 6-9. That is, he has not cited any authority involving a prosecution under 8 U.S.C. § 1326 whereby a defendant was permitted to challenge the classification of the predicate offense underlying his removal other than pursuant to the requirements of Section 1326(d). Instead, like Gonzalez-Ferretiz, Segura cites several

appellate decisions wherein courts have found that the Board of Immigration Appeals lacked jurisdiction to order an alien's removal where an immigration judge had not ordered removal. See Rhodes-Bradford v. Keisler, 507 F.3d 77 (2d Cir. 2007); James v. Gonzales, 464 F.3d 505 (5th Cir. 2006); Noriega-Lopez v. Ashcroft, 335 F.3d 874 (9th Cir. 2003). Those decisions did not arise in the context of a Section 1326 prosecution. Moreover, in the Section 1326 context, it appears that courts address arguments about whether a predicate offense was an "aggravated felony" under the Section 1326(d) requirements. See, e.g., United States v. Martinez-Hernandez, 912 F.3d 1207, 1211-15 (9th Cir. 2019) (analyzing argument under Section 1326(d)(3)); United States v. Almanza-Vigil, 912 F.3d 1310, 1316 (10th Cir. 2019) (same). Thus, the cases on which Segura relies do not direct the inquiry here.

At bottom, the Court's reasoning in Gonzalez-Ferretiz applies in full force here. Segura has not cited any authority to change the analysis. Accordingly, the Court rejects Segura's "jurisdictional" argument.[16]

---

[16]    During the evidentiary hearing, counsel for Segura acknowledged that the Court had previously rejected this argument in Gonzalez-Ferretiz. Accordingly, counsel focused his argument on Section 1326(d).

## C. Section 1326(d)

Next, it is necessary to consider whether Segura has satisfied the three requisites of Section 1326(d). See Moreno-Tapia, 848 F.3d at 166; Gomez-Salinas, 2019 WL 1141063, at *2-4; Romero-Caceres, 356 F. Supp. 3d at 546-47. Segura has the burden to show that he has satisfied all three requirements of Section 1326(d) by a preponderance of the evidence. Galcia, 2016 WL 4054926, at *2; see also El Shami, 434 F.3d at 663 (discussing how the "requirements are listed in the conjunctive, so a defendant must satisfy all three in order to prevail").

For the reasons set forth below, Segura has failed to demonstrate that he satisfies (or is excused from) Section 1326 (d)(2) or (d)(3). Accordingly, his collateral attack on the 2001 deportation order fails.

### (1) Exhaustion Of Available Administrative Remedies

It is uncontroverted that Segura never sought "any administrative remedies that may have been available to seek relief against the [2001 removal order]." 8 U.S.C. § 1326(d)(1); ECF No. 11 at 11; ECF No. 12 at 20-21. It is also uncontroverted that Segura selected a check-box on his I-851 form stating that he did not wish to challenge his deportation and waiving any rights to review. See Gov't Ex. 2. At oral argument (and in his briefs), counsel for Segura initially argued that Segura was excused from

exhausting administrative remedies under Etienne v. Lynch, 813 F.3d 135 (4th Cir. 2015) because the I-851 form did not provide an avenue to challenge the legal basis for his deportation (i.e. whether he had been convicted of an "aggravated felony" under the INA). However, counsel later took the view that there was no administrative remedy for which Segura qualified. Thus, the argument goes, Section 1326(d)(1) is inapplicable because there was nothing that Segura could have exhausted. The Government does not specify which administrative remedies were available to Segura, but does not concede that there were no administrative remedies for him to pursue.

Etienne v. Lynch applies to establish Segura's satisfaction of Section 1326(d)(1). See 813 F.3d at 137-42. In Etienne, the Court of Appeals had to decide whether it had jurisdiction to review Etienne's expedited removal order under 8 U.S.C. § 1252(d)(1), which requires that an alien "exhaust[] all administrative remedies available to the alien as of right" before the Court of Appeals has jurisdiction. Id. at 138. Exhaustion of administrative remedies, the Fourth Circuit held, "means using all steps that the agency holds out, and doing so properly." Id. at 141 (quoting Woodford v. Ngo, 548 U.S. 81, 90 (2006)) (emphasis in original). The Court of Appeals concluded that the expedited removal proceedings and the I-851 form (nearly identical to the

22

one provided to Segura) did not provide a way for aliens like Etienne to challenge the legal basis for their removal. See id. at 138-42. Because there was no way to raise such a challenge on the form, Etienne "was not required to raise his legal challenge to removal in order to meet the [administrative] exhaustion requirement," id. at 142, and the Court thus had jurisdiction to proceed to consider whether Etienne had been convicted of an "aggravated felony." See id. at 142-45.

Of course, Etienne arose in a different context than is presented in this case (whether the Court of Appeals had jurisdiction to review Etienne's petition for review of his expedited removal proceedings, not in a Section 1326 prosecution). And, notably, the alien in Etienne had indicated on his I-851 form that he wished to challenge his deportation (although he did not specifically state that he believed that his conviction was not an "aggravated felony"), id. at 137-38, while Segura clearly indicated that he did not wish to contest removal on any grounds. See Gov't Ex. 2.

Notwithstanding these differences, the Court is constrained to apply the holding of Etienne that, in expedited removal proceedings involving the I-851 form (as here), an alien need not have raised a legal challenge to the expedited removal in order to satisfy an administrative exhaustion requirement because there was

no available administrative remedy. That holding applies equally to the administrative exhaustion requirement of Section 1326(d)(1). Accordingly, under Etienne, Segura has satisfied Section 1326(d)(1).

### (2) Deprivation Of An Opportunity For Judicial Review

It is uncontroverted that Segura did not seek judicial review of the 2001 deportation order until now. See 8 U.S.C. § 1326(d)(2). The I-851 form served on, and signed by, Segura clearly informed Segura that he could "seek judicial review of any final administrative order by filing a petition for review within 30 calendar days after the date such final administrative order is issued, or you may waive such appeal by stating, in writing, your desire not to appeal." Gov't Ex. 2 (front side). And, on the back side of the I-851 form, Segura selected check-boxes stating that he "waive[d] [his] right to rebut and contest the above charges and [his] right to file a petition for review of the Final Removal Order" and that he "waive[d] the 14 day period of execution of the Final Removal Order."[17] Id.

---

[17]    In expedited removal proceedings, an alien has a statutory right to remain in the United States for "14 calendar days. . .from the date that such [Final Order] was issued, unless waived by the alien, in order that the alien has an opportunity to apply for judicial review under section 1252 of this title." 8 U.S.C. § 1228(b)(3); Lopez-Collazo, 824 F.3d at 457.

Now, nearly 20 years later, Segura argues that his waiver was not "considered or intelligent" and that the waiver is therefore invalid. See ECF No. 11 at 12-13. That is so, he argues, because he did not know that he could challenge the "aggravated felony" determination. Therefore, he argues that he is excused from satisfying the judicial review prong of Section 1326(d)(2).

There is no doubt that an alien's waiver of his right to judicial review must be "considered [and] intelligent." See Mendoza-Lopez, 481 U.S. at 840; cf. Narine v. Holder, 559 F.3d 246, 249-50 (4th Cir. 2009) (waiver of appellate rights must be "knowingly and intelligently made").[18] Where waiver of such rights is at issue, some courts, including some district courts in this Circuit, have held that it is the Government's burden to prove that the alien's waiver was valid. See United States v. Gomez, 757 F.3d 885, 893-94 (9th Cir. 2014); United States v. Lopez-Collazo, 105 F. Supp. 3d 497, 511 (D. Md. 2015), rev'd on other grounds, 824 F.3d 453 (4th Cir. 2016); United States v. Merino-Hernandez, 46 F. Supp. 3d 602, 607 (D. Md. 2014). However, unpublished Fourth Circuit authority suggests that the alien must "demonstrate that his waiver was invalid." See United States v. Lopez, 667 Fed. Appx.

[18]    The Court does not view the difference in terminology between Mendoza-Lopez and Narine as having any significance. However, because Mendoza-Lopez is a Supreme Court decision dealing with 8 U.S.C. § 1326, the Court will use "considered [and] intelligent" in this Opinion.

837, 838 n.1 (4th Cir. 2016) (per curium) (unpublished). For the purposes of this Opinion, it is not necessary to resolve the burden of proof issue because the record is clear that Segura gave a "considered [and] intelligent" waiver of his right to judicial review, no matter which party bears the burden of proof.

In support of the argument that his waiver was invalid, Segura relies largely on two cases. First, he argues that the Supreme Court's decision in Mendoza-Lopez establishes that his waiver was not "considered or intelligent," thereby improperly depriving him, like the aliens in Mendoza-Lopez, of judicial review. See 481 U.S. at 840. In Mendoza-Lopez, an immigration judge had failed to properly advise the aliens of their right to apply for suspension of deportation, and then accepted "their unknowing waivers" of the their right to appeal. See id. at 831-32, 840. As the Supreme Court held:

> The Immigration Judge permitted waivers of the right to appeal that were not the result of considered judgments by respondents, and failed to advise respondents properly of their eligibility to apply for suspension of deportation. Because the waivers of their rights to appeal were not considered or intelligent, respondents were deprived of judicial review of their deportation proceeding.

Id. at 840.

Mendoza-Lopez presents a materially different factual case than Segura's. Most importantly, in Mendoza-Lopez, the suspension

of deportation that the immigration judge failed to advise the aliens about was a form of statutory discretionary relief that the aliens might have been eligible for had they known about it. Id. at 831 & n.3. Segura has identified no similar statutory right to relief that was available and about which he was not advised. And, indeed, he was advised of, and waived, the right of judicial review. Instead, his argument is that he was deprived of judicial review because he was not informed that, on judicial review, he could challenge whether his underlying conviction was for an "aggravated felony."

In Rivera Lopez, Judge Brinkema rejected a similar argument based on Mendoza-Lopez in the context of an alien who signed a "Stipulated Request for Order and Waiver of Hearing" and then argued in his later Section 1326 prosecution that his waiver was not knowing and voluntary. 355 F. Supp. 3d at 432-33, 440-41 & n.18. As Judge Brinkema noted, "whereas the noncitizens in Mendoza-Lopez were deprived of critical information related to affirmative rights they held under the INA, defendant here had no affirmative right to a hearing to be held within a given time." Id. at 440 n.18. So too here.

In Segura's case, the expedited removal statute provides a right to judicial review, see 8 U.S.C. § 1228(b)(3), and the I-851 form clearly set out that right. See Gov't Ex. 2; see also

Lopez-Collazo, 824 F.3d at 457 (describing statutory judicial review right in expedited removal proceedings); id. at 461 n.3 (expedited removal scheme "in and of itself, comports with the minimum requirements of due process" because, inter alia, it allows the alien to seek judicial review) (citation omitted). While the I-851 form does not state that the alien may challenge the "aggravated felony" determination, it does not tell the alien he may not challenge that determination either. Segura waived his statutory right to judicial review, and Mendoza-Lopez does not establish that such a waiver was not considered and intelligent.

Segura also relies on Etienne to argue that, because the I-851 form did not inform him that he could challenge the legal basis of his deportation, "[a]ny purported waiver of appeal, or failure to appeal or exhaust administrative remedies is therefore not knowing and intelligent." ECF No. 13 at 20. Etienne does not control the analysis here. As discussed above, Etienne arose in a different context and notably involved an alien who affirmatively chose to challenge his removal. 813 F.3d at 137-38. That is not the case here. And, as the Court reads Etienne, its application in the Section 1326 context is limited to, at most, the exhaustion of administrative remedies prong of Section 1326(d)(1), not to the judicial review prong of Section 1326(d)(2). Etienne dealt with the Court of Appeals' jurisdiction to hear an appeal of the alien's

expedited deportation (including the "aggravated felony" determination) <u>at the time he was being deported</u>, and did not purport to establish the principle for which Segura argues.[19]

The foregoing authorities and the record in this case make clear that Segura made a considered and intelligent waiver of his right to judicial review. First, Segura acknowledges that, at the time in issue, he spoke and understood English, so there is no language issue in this case. Second, retired immigration officer Toms testified that his practice was to read and review the I-851 form with the alien before having him sign it. He testified that this practice included the waiver portion of the form; if the alien indicated that he did not wish to fight deportation after Toms read the form, Toms would mark the form accordingly. In other words, Toms' testimony establishes that Segura's waiver was made after an explanation by Toms.

Third, Segura's argument that he was deprived of judicial review because he was not informed of a specific matter that he could appeal (<u>i.e.</u> that he could challenge the "aggravated felony" determination) does not comport with how courts typically advise

---

[19]    To the extent that Segura relies on <u>El Shami</u>, that reliance is likewise misplaced. <u>El Shami</u> was a case in which the alien was never sent notice of his deportation hearing, and therefore did not have an opportunity to apply for any relief or seek judicial review. <u>See</u> 434 F.3d at 663-64. In contrast, Segura was personally served with the I-851 form and affirmatively waived his right to judicial review. <u>El Shami</u> is inapposite.

defendants of appellate rights. Courts do not inform defendants of each aspect of their case that they may appeal. Even where a specific right of appeal is affirmatively defined (which the one Segura seeks is not), a court's failure to advise a defendant about that right is not necessarily fatal. See Peguero v. United States, 526 U.S. 23, 24-28 (1999) (failure to advise defendant of right to appeal sentence as required by Fed. R. Crim. P. 32 did not permit collateral relief where defendant "had full knowledge of his right to appeal"). Absent authority to the contrary (which Segura has not provided), the Court will not adopt a rule that immigration officials must explain every theory that might be presented on appeal.

Lastly, Segura has presented no evidence that he would have sought judicial review in 2001 if he had been advised that he could challenge the "aggravated felony" determination. Unlike the alien in Etienne, Segura did not indicate in any way that he wanted to fight deportation. Only now, when he is called to account for his illegal re-entry, does Segura argue that he was deprived of judicial review. And, his position is based solely on an argument made by counsel. Argument of counsel is not evidence and there is no evidence that supports Segura's position.

For the foregoing reasons, Segura has not established that his 2001 expedited removal proceeding improperly deprived him of judicial review. Thus, he fails Section 1326(d)(2).

### (3) Fundamental Unfairness

Nor has Segura established that the 2001 removal order was fundamentally unfair. To satisfy Section 1326(d)(3), Segura "must show that (1) his due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." El Shami, 434 F.3d at 664. As El Shami held, "due process requires an alien who faces [removal] be provided (1) notice of the charges against him, (2) a hearing before an executive or administrative tribunal, and (3) a fair opportunity to be heard." 434 F.3d at 665; see Lopez-Collazo, 824 F.3d at 460-61; id. at 461 ("[A]n alien subject to expedited removal is entitled to the opportunity to be heard at a meaningful time and in a meaningful manner.") (internal quotation omitted). And, "[t]he expedited administrative removal scheme, in and of itself, 'comports with the minimum requirements of due process.'" Lopez-Collazo, 824 F.3d at 461 n.3 (quoting United States v. Benitez-Villafuerte, 186 F.3d 651, 657-58 (5th Cir. 1999) (Jolly, J.)).

To demonstrate prejudice, Segura must establish that, "but for the errors complained of, there was a reasonable probability

that he would not have been deported." El Shami, 434 F.3d at 665; Lopez-Collazo, 824 F.3d at 462. "This is not a generalized showing of prejudice; rather, the defendant must link the actual prejudice he claims to have suffered to the specific due process violation at issue." Lopez- Collazo, 824 F.3d at 462.

Segura asserts the following due process violations: that he was not deportable as charged and that immigration officials improperly served the 2001 Final Order on him.[20] See ECF No. 11 at 13-14; ECF No. 13 at 14-16. Taking the second argument first (service of the 2001 Final Order), Toms testified in great detail about the steps that his office took in 2001 to serve Final Orders, like the one at issue in this case. Although he testified that he was not aware of whether there was a record of whether the 2001

---

[20]    In a different part of his brief, Segura appears to argue in passing for additional due process violations:   that "Segura was not informed in his native language of the nature or basis of the proceedings" and that he "was not advised of his right to challenge the legal conclusion that his conviction of forgery [sic] was an aggravated felony." ECF No. 11 at 11.

To the extent that he relies on these additional due process violations, they are meritless.  First, immigration officials must "provide the alien with a written translation of the Notice of Intent or explain the contents of the Notice of Intent to the alien in the alien's native language or in a language that the alien understands."  8 C.F.R. § 238.1(b)(2)(v) (emphasis added); Lopez-Collazo, 824 F.3d at 462. The record is clear that Segura understood English, so the fact that it is not his native language is of no moment. Second, as described above, Segura has not established that he has a right to learn of every aspect of his deportation that he might appeal.

32

Final Order (with the approving official's signature) was served on Segura, he did testify that a copy of the 2001 Final Order would have been given to Segura, based on his practice at the time. Based on Toms' testimony (and the complete lack of any contrary evidence from Segura), the Court finds that Segura received signed and unsigned copies of the 2001 Final Order. Segura does not argue that this alleged due process violation prejudiced him. See Lopez-Collazo, 824 F.3d at 466 ("The defendant's burden is to show that actual prejudice resulted from the due process violation at issue.") (emphasis in original). Thus, even if this alleged due process violation is otherwise viable (which it is not), it would not satisfy Section 1326(d)(3) because Segura has not attempted to demonstrate that it prejudiced him.

Segura also argues that he was not deportable as charged, and that is a due process violation. His conviction under Cal. Penal Code § 261.5(c) is no longer an "aggravated felony" after Esquivel-Quintana v. Sessions, 137 S.Ct. 1562 (2017), he argues. As Segura acknowledges, the "Fourth Circuit has not directly addressed the argument that the entry of a removal order on a legally erroneous basis is a due process violation." ECF No. 11 at 13. However, in Lopez-Collazo, the Court discussed errors of law and due process violations:

> Although an error of law, without more, "will
> ordinarily not rise to the level of a due

process violation," <u>United States v. Torres</u>,
383 F.3d 92, 104 (3d Cir. 2004), there might
be circumstances under which some courts would
conclude that a misapplication of the law as
it existed at the time—not as understood in
light of subsequent judicial decisions—led to
a due process violation, <u>see United States v.
Pallares-Galan</u>, 359 F.3d 1088, 1100-01 (9th
Cir. 2004). Under such circumstances, it might
be possible for the court to conclude that
"but for" the misapprehension of the law,
defendant would not have been removed. But
even these courts do not require the agency to
be clairvoyant, "inform[ing] the alien of a
future interpretation of the law" regarding
"what the meaning of the law always was in
some theoretical way." <u>United States v. Vidal-
Mendoza</u>, 705 F.3d 1012, 1018-19 (9th Cir.
2013) (internal quotation marks omitted).

<u>Lopez-Collazo</u>, 824 F.3d at 467; <u>but see id.</u> at 468 (Gregory, C.J.,

dissenting) (questioning this approach).

Recognizing that the Fourth Circuit has not held that an error

of law establishes a due process violation, Segura cites <u>United

States v. Aguilera-Rios</u>, 769 F.3d 626 (9th Cir. 2014), for the

proposition that, "where the defendant was not deportable as

charged[,] [that is] both a due process violation and prejudice."

ECF No. 11 at 14.  It is true that the Ninth Circuit has held

that, if an alien "was removed when he should not have been, his.

. .removal was fundamentally unfair, and he may not be convicted

of reentry after deportation." <u>Aguilera-Rios</u>, 769 F.3d at 630

(quoting <u>United States v. Camacho-Lopez</u>, 450 F.3d 928, 930 (9th

Cir. 2006)). Notably, <u>Aguilera-Rios</u> did not deal with an alien who

was removed pursuant to expedited removal procedures and involved an alien who was a lawful permanent resident. See id. at 628-29. Segura does not explain how (if at all) these clear differences should affect the analysis.[21]

In any event, the Fourth Circuit's decision in Lopez-Collazo controls here and it establishes two principles. First, in expedited removal proceedings, due process requires that the alien have "'the opportunity to be heard at a meaningful time and in a meaningful manner.'" Lopez-Collazo, 824 F.3d at 461 (quoting El Shami, 434 F.3d at 664-65)). Under this rule, a due process

---

[21]    At oral argument, counsel for Segura briefly raised United States v. Valdivia-Flores, 876 F.3d 1201 (9th Cir. 2017), a case involving expedited removal, in which the Court held that the alien satisfied Section 1326(d)(1) and (d)(2) because he did not give a "considered and intelligent" waiver of his right to have his expedited removal reviewed. See id. at 1206. It also concluded that the alien's state conviction did not qualify as an "aggravated felony," establishing the "fundamental unfairness" prong of Section 1326(d)(3). See id. at 1206-10.

Valdivia-Flores has important factual differences to Segura's case. The Court found that Valdivia-Flores' waiver of his right to judicial review was invalid because, inter alia, the I-851 form did not give the alien the opportunity to challenge the "legal conclusion underlying his removability," the alien had requested a hearing before an immigration judge (which apparently was ignored), and the "government provide[d] no evidence that an immigration officer ever met with [the alien] to explain the form or the issues it raised." See id. at 1206. Here, as discussed above, the Government presented evidence from Toms that he would have reviewed the I-851 with Segura, including the waiver portion. And, as discussed below, the Court is bound by Fourth Circuit authority regarding whether a due process violation has been established.

violation may be established where the expedited removal proceedings are conducted in a language that the alien does not understand. See id.; see also Nazarova v. INS, 171 F.3d 478, 484 (7th Cir. 1999); Marincas v. Lewis, 92 F.3d 195, 204 (3d Cir. 1996). Here, the record is clear that Segura spoke and understood English. And, the record is devoid of other evidence or argument that Segura did not have "the opportunity to be heard at a meaningful time and in a meaningful manner." Lopez-Collazo, 824 F.3d at 461; id. at 461 n.3; Benitez-Villafuerte, 186 F.3d at 657. That is not changed by Segura's argument that he did not know about a possible challenge to the "aggravated felony" determination.

The second principle flowing from Lopez-Collazo is that "an error of law, without more, will ordinarily not rise to the level of a due process violation. . .[but that] there might be circumstances under which some courts would conclude that a misapplication of the law as it existed at the time—not as understood in light of subsequent judicial decisions—led to a due process violation." Lopez-Collazo, 824 F.3d at 467 (internal citations and quotations omitted) (emphasis added). Simply put, this is not one of those cases.

Contrary to the Government's argument, Ninth Circuit case law in 2001 (when Segura was removed) was not clear about whether Cal. Penal Code § 261.5(c) constituted an "aggravated felony" for

"sexual abuse of a minor." Not until 2006 did the Ninth Circuit issue a published decision so holding. See Afridi v. Gonzales, 442 F.3d 1212, 1215-1217 (9th Cir. 2006) (affirming the Board of Immigration Appeals' determination that Cal. Penal Code § 261.5(c) was an "aggravated felony" for "sexual abuse of a minor"), overruled by, Estrada-Espinoza v. Mukasey, 546 F.3d 1147 (9th Cir. 2008). Two unpublished opinions in 2004 applied the modified categorical approach to hold that a conviction under Cal. Penal Code § 261.5(c) qualified as an "aggravated felony" for "sexual abuse of a minor." See Tabalanza v. Ashcroft, 109 Fed. Appx. 995, 995-97 (9th Cir. 2004) ("Under our case law, sexual conduct with a 14-year-old qualifies as 'sexual abuse of a minor.'") (unpublished); Valdez-Camacho v. Ashcroft, 110 Fed. Appx. 808, 809-11 (9th Cir. 2004) ("Under our case law, sexual conduct with a 15-year-old qualifies as 'sexual abuse of a minor.'") (unpublished).

Of course, the Court recognizes that these cases were decided after Segura was found to have committed an "aggravated felony" in 2001 and removed. Neither the Court nor the parties have located a Ninth Circuit case that controlled the question of whether Cal. Penal Code § 261.5(c) was an "aggravated felony" for "sexual abuse of a minor" in 2001. However, that lack of background law does not mean that immigration officials performed "a misapplication of the

law as it existed at the time" of Segura's removal. Lopez-Collazo, 824 F.3d at 467.

The Fourth Circuit has yet to hold that, in immigration proceedings, an immigration officials' error of law is a due process violation. But, if and when it does, Lopez-Collazo teaches that, to violate due process, such an error must have been "a misapplication of the law as it existed at the time" of the removal proceedings, "not as understood in light of subsequent judicial decisions." 824 F.3d at 467. In other words, the decision in Esquivel-Quintana would not work to establish a due process violation under Lopez-Collazo. Here, immigration officials did not misapply the law. Rather, as Toms testified, in determining whether Segura had been convicted of an "aggravated felony," he referred to a list of California statutes that, in 2001, were considered "aggravated felonies." One of those statutes was Cal. Penal Code § 261.5(c). There was no authority at the time holding otherwise. Thus, even assuming that an error of law could be a due process violation, Segura fails to establish such a violation.[22]

Because Segura has failed to meet his burden to demonstrate a due process violation, he necessarily fails to meet Section

---

[22]    And, while cases from 2004 and 2006 cannot establish what the law was in 2001, cases like Tabalanza and Afridi suggest that immigration officials did not misapply the law in 2001 because those later cases held that Cal. Penal Code § 261.5(c) was an "aggravated felony" for "sexual abuse of a minor."

1326(d)(3), and it is not necessary to discuss the "prejudice" aspect of Section 1326(d)(3).[23]

Segura has failed to meet his burden to establish that he has satisfied or is excused from Section 1326(d)(2) or (d)(3). Accordingly, his collateral attack fails and the Motion will be denied.

**CONCLUSION**

For the foregoing reasons, DEFENDANT'S MOTION TO DISMISS THE INDICTMENT (ECF No. 11) will be denied.

It is so ORDERED.

/s/     *REP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 15, 2019

---

[23] Segura argues that Lopez-Collazo's holding that courts must apply the law at the time of the deportation proceeding should be overruled. ECF No. 13 at 10-14. Whatever the merits of this argument, this Court is bound by Fourth Circuit precedent and declines Segura's invitation to do otherwise.